IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                                        CIVIL NO. 01-1803 (RLA)

A)  $58,920.00 IN U.S. CURRENCY
B)  $38,670.00 IN U.S. CURRENCY

    Defendants.

## OPINION AND ORDER

MIGUEL REYES and PATRICIO GONZALEZ, Claimants in this foreclosure action, filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56(c) (docket No. 38), asking the Court to order the return of the monies seized from them on February 20, 2001. Claimants allege lack of probable cause on the part of the Government. The United States government has opposed. See United States Opposition to Motion for Summary Judgment (docket No. 49).

The Court having reviewed the memoranda submitted by the parties as well as the applicable law, hereby **GRANTS** claimants' motion for summary judgment for the reasons set forth below.

### FACTUAL BACKGROUND

On February 20, 2001, the claimants traveled from New York City, New York to San Juan, Puerto Rico on American Airlines flight No. 677. According to their deposition, claimants traveled wearing normal clothes, jeans, t-shirts, casual clothing. REYES was wearing

**CIVIL NO. 01-1803 (RLA)**                                    **Page 2**

---

a black leather overcoat; his hair was in combed dreadlocks from the front to the back of his head.

After claimants deplaned and were walking towards the exit of the Luis Muñoz Marín International Airport, GONZALEZ, who was walking behind REYES, noticed that an agent had begun to follow REYES.  What follows is described by Task Force Agent Damaris Lebrón in her deposition: She and Task Force Agent Borges "...entered through the security point of Gate 5 [and] we were on our way on the hallway between Gate 5 and Gate 8, and when we got to Gate 8, we realized that the New York flight was coming out, it had just arrived." Continuing, she declared that "when some passengers had already come down, they had already left Gate 8, we observed a young man, a tall young man, with a carry on bag, suitcase, dressed with a black jacket, he passed us, we observed him when he passed us.  All of a sudden, we observed that the young man stopped and look[ed] backwards, looking as if somebody was coming behind him.  All of a sudden, we observe another young man also, a tall man, also came with a carry on, the dressing is, the clothing is similar to that one worn by the young man who turned around, who looked back."

She added that "[w]hen the first one looked backwards and saw the other young man that came, was coming, well, he continued walking... [t]hey continued walking and we decided what procedure, just followed them to see where they were going and the one in the

**CIVIL NO. 01-1803 (RLA)**                                          **Page 3**

front always looked back to see that the person was coming close to him."

She further added that "[t]hese young men instead of going to the baggage area to be picked up or to take a cab, and these young men instead of going down, they went through the security center #5. When they went out through the revolving doors, the person who was, the young man who was in front, again looked to the back to see if the other person was following.  They went pas[t] the area where the Agriculture machine is located and they went towards the front of the American Airlines area.  Instead of waiting for someone to pick them up, they crossed the street and went towards the parking, always the person in front would look towards the back to see if the young man was following him."

She also declared that "[t]hey were walking pretty fast but the young man in the front always [looking] to the young man in the back" and that the agents were observing them from a distance of about eight feet behind.  The agents followed the claimants and observed that when they entered the parking lot, they were going pretty fast,... no[t] running... "but they were walking pretty fast."

When the agents arrived at the first stairway of the parking lot, which is on the left-hand side, they stayed with the second young man and Agent Borges requested the other young man to stop. This was confirmed by Agent Borges in his statement:

> "... we noticed that when he was walking, he was using a
> pretty fast pace, but he was looking back to see if he

could spot somebody or looking for someone, so he just
continued his pace. As he walked on, he just kept on
looking towards the back. The other person, which is the
man next to him, they were both on the same trail, when
they got to gate 5, instead of going downstairs to pick up
luggage, they just walked out through the security check
point on Gate 5 and from there, went straight towards the
parking lot."

Upon arrival to the parking lot, they were approached by Task Force Agents Angel Borges and Damaris E. Lebrón.  Agent Borges ordered them to stop and began interrogating REYES. He, REYES, was asked if he was carrying a large amount of money, to which he answered in the negative.  At no time was he asked if he was carrying narcotics.  Agent Borges further declared in his deposition that they (Borges and Lebrón) identified themselves as Task force agents for the DEA, and asked claimants for a photo ID and a boarding pass. REYES provided a driver's license and a boarding pass.  He was asked if he was traveling alone and he stated that he was.  Then REYES was asked if the agents could search his roller-type suitcase, to which he agreed.  Agent Borges declared that the reason he decided to ask if REYES was carrying a large amount of money was because he noticed that the claimant was very nervous.

Agent Borges then ordered REYES to open his suitcase.  REYES agreed and proceeded to remove his clothes from the suitcase.  When Borges pulled up on a pair of jeans, money spilled out to the floor. A total of $38,670.00 was found.  When asked by Agent Borges where the money came from, REYES indicated that it came from earnings of his music career, business and an insurance claim.  While they were

**CIVIL NO. 01-1803 (RLA)**                                    **Page 5**

still at the parking lot, REYES offered to provide evidence that the money came from legal sources and that it was in his van parked nearby.  According to REYES, the offer was denied by the agents. Instead, Agent Borges ordered REYES to accompany them to the office of the Drug Enforcement Administration (DEA), located in the basement of the airport, for an interview related to the case.  He informed REYES that he was not arrested, but could leave whenever he wanted and should wait for a receipt in case the money should be seized. According to Lebrón's deposition testimony, REYES could leave despite the fact that "he had not provided the legal source for the money and the contradiction of the two young men, one was saying yes the other one saying no."

     While Agent Borges was searching REYES' suitcase, Agent Lebrón intervened with claimant GONZALEZ, about 15 feet away from REYES. Lebrón claims that she identified herself, asked if she could speak with him (GONZALEZ) for a moment, to which he agreed.  She asked him if he was with REYES and he said no.  Agent Lebrón asked him for identification and his boarding pass; GONZALEZ provided his Dominican passport and his residence card.  As to his boarding pass, GONZALEZ indicated he had left it on the seat of the plane.  Agent Lebrón asked him where he traveled from, if he traveled alone, or if he knew REYES.  He told her that he traveled alone to New York and that he did not know REYES.  The agent asked whether he had money with him and GONZALEZ answered that he had around $30,000.  Asked as to why he

had such large sums, claimant responded that it was to buy cars in auctions to resell them in Puerto Rico.  At that moment his luggage was not searched and at no time did the agent ask him if he had any narcotics.

Agent Lebrón continued interrogating claimant GONZALEZ.  She asked him to identify the origin and legal source of the money. GONZALEZ told her that he had sold a money transfer agency and a taxi license for Puerto Rico.  He informed her that he had sold the latter in Puerto Rico but had taken the proceeds to New York to purchase some vehicles.  GONZALEZ claimed that he did not like the vehicles he saw in New York, so he returned with the money.  Agent Lebrón then asked claimant GONZALEZ whether he had any evidence regarding the sales of the money transfer agency and the taxi license.  GONZALEZ indicated that he did not have the documentation with him but he could provide it as soon as he got to his house.  Agent Lebrón then asked him for authorization to search his suitcase, to which he consented, but Agent Lebrón did not search it at that time.

When they arrived at the DEA office they were placed in separate rooms.  Agent Borges continued to question REYES about the money, its source and the reasons why he was traveling with such large sums. REYES reiterated that the money was to buy cars in auctions to resell them in Puerto Rico.  Agent Borges inquired if the money had anything to do with drugs.  At that point REYES offered to provide the documentation, which was in his car in the parking lot.  He was

**CIVIL NO. 01-1803 (RLA)**                                          **Page 7**

informed that they needed to count the money; that he was not detained; however, if he wanted to recover the money he would have to wait until the money was counted.

When all parties arrived at the DEA office, the Agents asked the K-9 handler to escort the K-9 through the suitcases.  At this point, Gonzalez' suitcase still had not been opened.  When the K-9 alerted as to a possible positive to contamination, GONZALEZ was asked to open the suitcase.  GONZALEZ acquiesced and Agent Lebrón searched it, finding the cash in question.  No drugs were discovered.

Agent Lebrón proceeded to inform GONZALEZ that he was not detained, that if the money was not his he could leave and nothing would happen to him.  According to GONZALEZ, he declined because the money represented part of his savings which he did not want to lose.

While at the DEA office the agents conducted a background check of claimants' documents in all fifty states, Puerto Rico, and the federal jurisdiction, but nothing incriminating was reported.

Finally, claimants were informed that the money was being confiscated because they had not reported it.  The agents informed REYES that his money was being confiscated because he had no evidence to justify having that amount of money with him, and because they believed that he was engaged in money laundering.

According to Agent Lebrón, she had probable cause to confiscate the money based on the following: 1) claimants had not been able to provide the documentation demonstrating the legality of the monies;

and 2) conflicting stories among the claimants themselves.  Agent Lebrón acknowledged that these facts and the K-9 alert were the only facts that led her to conclude that she had probable cause to believe that the money was the product of an illegal activity.

Along these lines, Agent Borges stated:

> We seized the money, one, because as soon as he got off of the aircraft, we notice[d], or I notice[d] that he was very nervous, second, as soon as I asked him if he was traveling with someone, he lied to me, he said no that he was alone, third, I asked him if he had a large amount of money, which he responded to in the negative, which is no, after that, when we get to the office, then he changes his version and that he is traveling with the other man. We seized the money, we needed documentation of where did he get that money from.

It appears that the only thing that called his attention was that REYES was nervous and that he was looking back, as though looking for someone.  Apparently this was thought to be sufficient evidence that claimant was engaged in some unspecified unlawful activity.

After the monies were seized and this civil forfeiture action commenced, Claimants submitted to the government the documentation pertinent to the legality of the seized monies, as follows:

(a)  Proof of sale of a business by claimant Patricio González Inoa for $42,000.00 on February 16, 2001;

(b)  Proof of the sale of a taxi license for $9,000.00 by Patricio González Inoa;

(c)  An insurance claim of $50,605.00 by claimant Miguel Reyes Ballista for loss of property in his business during a burglary and fire.

The government also received copies of claimants' income tax returns from 1997 to 2000 which show that they were engaged in legal businesses.

The government proffered no evidence to impeach the aforementioned documentation.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Santiago Clemente v. Executive Airlines, Inc., 7 F. Supp.2d. 114 (D.P.R. 1998); aff'd, 213 F.3d 25 (1st Cir. 2000).

Not every factual controversy bars access to summary judgment. The mere presence of some alleged factual conflicts among the parties will not defeat a proper motion for summary judgment; the requirement is that there be no genuine issue of material fact. Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 158 (1st Cir. 1998); Wadsworth, Inc. v. Schwarz-Nin, 951 F. Supp. 314 (D.P.R. 1996); Preussag Int'l Steel Corp. v. Interacero, Inc., 951 F. Supp. 338 (D.P.R. 1997).

CIVIL NO. 01-1803 (RLA)                                        **Page 10**

The U.S. Supreme Court, in its leading case regarding the summary judgment standard, established that:

> The plain language of *Rule 56(c)* mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.

Connell v. Bank of Boston, 924 F.2d 1169, 1172 (1st Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)).

Celotex allows the movant to seek summary judgment based on the adverse party's failure to establish an element essential to its case and on which that party bears the burden of proof. The only requirement is that there be "adequate time for discovery."

"If the moving party demonstrates that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-moving party to establish the existence of a genuine material issue." J. Geils Band Employee Benefits Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1251 (1st Cir. 1996), cert. denied, 519 U.S. 823 (1996). An issue is genuine if it "must be decided at trial because the evidence, viewed in the light most flattering to the non-movant, would permit a rational fact finder to resolve the issue in favor of either party." Remington Inv., Inc. v. Quintero & Martinez Co., 961 F. Supp. 344, 350 (citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 673 (1st Cir. 1996)).

CIVIL NO. 01-1803 (RLA)                                    **Page 11**

On the other hand, if "the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation," Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996), then the court must grant summary judgment in favor of the moving party. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Landrau Romero v. Caribbean Restaurants, Inc., 14 F. Supp.2d 185, 188 (D.P.R. 1998) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

### THE CIVIL FORFEITURE STATUTE

The Government seeks to forfeit the defendant currency pursuant to *21 U.S.C. § 881*(a)(6) which provides that property constituting proceeds traceable to the illegal exchange of controlled substances is subject to forfeiture to the United States.

*21 U.S.C. § 881* provides, where pertinent:

> (a) The following shall be subject to forfeiture to the United States and no property shall exist in them:
> ...
> (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter...

The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), applies only to those forfeiture proceedings "commenced on or after [August 23, 2000]." See Pub. L. No. 106-185, § 21, 114 Stat. 202,

CIVIL NO. 01-1803 (RLA)                                    Page 12

225, 18 U.S.C. § 983, historical and statutory notes (U.S.C.A. Supp. 2000). This forfeiture proceeding was commenced on June 14, 2001, therefore it falls under CAFRA. This is crucial because CAFRA heightened the threshold the government must meet in order to find probable cause to seize property.

As such, under CAFRA, seized currency is subject to forfeiture if it was furnished or intended to be furnished in exchange for a controlled substance, is traceable to such an exchange, or was used or intended to be used to facilitate any violation of subchapter 21 of the United State Code. 21 U.S.C § 881(a)(6). In a civil forfeiture proceeding, the burden of proof is on the government to establish, by a preponderance of evidence, that the property is subject to forfeiture. 18 U.S.C. § 983 (c)(1).

Moreover, as in this case, if the government's theory is that the property/currency was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the government must "establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). See e.g. United States v. Armstrong, 722 F.2d 681, 686 (11th Cir. 1984) (discussing probable cause in the context of a seizure). It is important to note that in this action, inasmuch as the forfeiture was carried out pursuant to 21 U.S.C. § 881(a)(6), not just any criminal activity will support the

CIVIL NO. 01-1803 (RLA)                                          **Page 13**

forfeiture: the criminal wrongdoing must involve "the exchange of a controlled substance." Id.

As explained by this District Court in United States v. $21, 510.00; $10, 240.00; and Gent's Rolex Watch, 292 F. Supp. 2d 318 (D.P.R. 2003) "First Circuit opinions defining the preponderance-of-the-evidence standard are few and far between.  On one occasion, the First Circuit noted the standard was met when, '[a]fter the evidence has been weighed, th[e] proposition is proved if it is made to appear more likely or probable in the sense that actual belief in its truth, derived from the evidence, exists in the mind or minds of the tribunal notwithstanding any doubts that may still linger there'." Id. at 321. (citing O'Leary v. U.S. Lines Co., 215 F.2d 708, 715-716 (1st Cir. 1954)).

The controlling issue is whether, consistent with the summary judgment standard, the government has presented sufficient evidence to connect an alleged illegal drug trafficking activity to the currency; put another way, taking the record in the light most favorable to the government, has it shown --as required--  more than a mere suspicion that the currency  facilitated the sale of drugs? See, Gent's Rolex Watch, 292 F. Supp. at 321; United States v. Parcel of Land & Residence at 28 Emery Street, 914 F.2d 1, 4 (1st Cir. 1990).

Having considered all of the evidence presented by all parties, the Court finds that the government can offer only the following

CIVIL NO. 01-1803 (RLA)                                    Page 14

undisputed facts in support of the forfeitability of the defendant currency:

(1)  the DEA Task Force Agents Borges and Lebrón observed signs of nervousness in claimants GONZALEZ and REYES when they arrived in Puerto Rico from New York;

(2)  Both claimants purchased one-way tickets in cash.

(3)  Both claimants consented to be interviewed. Claimants both claimed to be traveling alone. GONZALEZ acknowledged carrying a large amount of currency.

(4)  Agent Borges searched REYES' suitcase after obtaining claimant's consent. He found $38,760.00 in cash in the pant leg of a pair of blue jeans. REYES' offer to provide the documentation as to the legality or source of funds at that time was ignored.

(5)  Agent Lebrón searched GONZALEZ' suitcase after obtaining claimant's consent. She found $58,920.00 in cash also inside a pair of jeans. GONZALEZ was unable to offer at that time, the documentation as to the legality or source of the monies. His offer to provide the documentation for the agents at a later time was ignored;

(6)  After being questioned, and after the search had been effected, REYES changed his original statement and stated that he had indeed traveled with GONZALEZ;

(7)  No drugs or narcotics were found in either suitcase despite the positive K-9 results to narcotics.

### DISCUSSION

### <u>Large Amount of Cash</u>

Although this Court acknowledges that carrying a large amount of cash may indicate criminal activity, it is in fact not necessarily illegal to transport money, interstate in this manner. We observe that this conduct, while possibly suspicious, is perfectly legal under this particular scenario, and within the right of both

claimants. Section 881(a)(6)'s probable cause standard cannot be interpreted so broadly as to inherently penalize legal conduct.

A large amount of cash does not -- alone – satisfy the government's burden to show probable cause. United States v. $121,100.00 in United States Currency, 999 F.2d 1503, 1506-1507 (11th Cir. 1993). In addition, to support a forfeiture under § 881, there must be a link to criminal activity, which activity must involve a narcotics transaction. The government simply has not met its burden here.

Although the evidence presented in support of probable cause need not "point to drugs to the exclusion of all other theories." $121,100.00, 999 F.2d at 1508, under § 881, the probable cause must be probable cause to believe a specific thing. Under § 881(a)(6), the Government must evidence a connection, beyond proof, that a drug crime may be one of several similarly likely possibilities -- between the seized money and an illegal narcotics transaction. The way the money here was packed, inside blue jeans, while possibly suggestive of some criminal activity, does not assist in making a more specific connection to drug crime.

That the currency was concealed in claimants' clothes adds next to nothing.[1]

---

[1] In a similar case the District Court for the District of Massachusetts took into account claimant's national origin in determining probable cause, citing various studies and surveys which indicated that Hispanics tend to travel with cash instead of using checks, credit cards or travelers checks reflecting a cultural lack

CIVIL NO. 01-1803 (RLA)                                              **Page 16**

Accordingly, this Court gives no consideration as to claimants' national origin in determining probable cause.

### Purchase of Tickets With Cash

We next consider that claimants purchased their tickets with cash. Business travelers often purchase airline tickets with credit cards or checks while drug couriers often do not, and this circumstance is an appropriate consideration when evaluating probable cause in the totality.  $ 121,100.00, 999 F.2d at 1507 (citing United States v. Socolow, 490 U.S. 1, 109 S. Ct. 1581, 1586, 104 L. Ed. 2d 1 (1989)).  However, in saying this, we do not mean to imply that the government can obtain forfeiture by showing the claimant's acts deviated from some vague reasonable-business-person standard. The standard is clear; the government must establish probable cause

---

of confidence of Hispanics in financial institutions.  See United States v. One Lot of $14,665, 33 F. Supp.2d 47 at 54 (D. Mass. 1998) and studies cited therein.

This Court declines to take national origin into consideration in a determination of probable cause for the following reasons:

1)    the surveys cited in the aforementioned case reflect the so-called "cultural habits" of a certain segment of the Hispanic population.  Not all Hispanics distrust financial institutions.  It depends on their economic, education and social class;

2)    Further, a mischief is created by the problem of determining who or what constitutes a Hispanic; a task so fraught with imponderables that it boils down to an exercise on futility, if not resulting in a time consuming side issue.

3)    A question is raised as to how the weighing of probable cause would apply if one of the claimants was allegedly Hispanic and the other a non-Hispanic.

beyond the preponderance of the evidence to believe that a substantial connection exists between the forfeited currency/property and an illegal drug transaction.  Moreover, the method claimants used to pay for their airline tickets, does little (if anything) to connect the money to an exchange of controlled substances, especially when both claimants were traveling with tickets purchased under their own names, and at all times produced identification to confirm their identity.

### Nervousness and Conflicting Stories

Aside from the natural nervousness that can occur when traveling, claimants' apparent nervousness is of minimal probative value, given that claimants were carrying a large amount of currency in their luggage, which could be robbed or lost.  <u>U.S. v. One Lot of U.S. Currency ($ 36,634)</u>, 103 F.3d 1048 (1st Cir. 1997).  Regardless of the source of the money, for security reasons, most travelers would be reluctant to draw any type of attention to themselves.

If you further consider that many, if not most, individuals can become nervous or anxious when detained by police officers, the nervousness is more than justified, <u>e.g.</u>, <u>United States v. One Lot of United States Currency ($ 14,665)</u>, 33 F. Supp. 2d 47, 55 (D. Mass. 1998) (noting that claimant's nervousness during interaction with law enforcement officers "is not an unreasonable response, regardless of the source and intended use of the currency").

CIVIL NO. 01-1803 (RLA)                                          **Page 18**

---

Furthermore, this does not suggest involvement in some unspecified furtive activity; or more specifically, that claimants had engaged, or were about to engage, in a drug related transaction with this currency. E.g., United States v. $ 5,000 in United States Currency, 40 F.3d 846, 850 (6th Cir. 1994) (stating that claimant's evasive explanation of purpose of trip provided, at best, "inchoate and unparticularized suspicion").

In this regard, we further point out that claimants' "suspicious" actions consisted mostly of providing inconsistent answers concerning the fact that they had traveled together, but the discrepancies cited by the government are not great. In any event, to the extent that the claimants' somewhat inconsistent answers might be suggestive of possible involvement in some criminal activity, we do not view the inconsistencies as a strong indication of the requisite narcotics nexus.

### K-9 Alert

The narcotics-detection dog's alert to the currency may also be worth noting, although perhaps worth little else. The probative value of dog alerts to the smell of narcotics on currency has been called into question of late. See United States v. $ 506,231.00, 125 F.3d 442, 453 (7th Cir. 1997); United States v. $ 53,082.00, 985 F.2d 245, 250 n.5 (6th Cir. 1993). In fact, it has been demonstrated that as much as 70-80% of money in circulation may carry the residue of narcotics.

CIVIL NO. 01-1803 (RLA)                                    **Page 19**

As the First Circuit Court stated in United States v. One Lot of U.S. Currency ($ 36,634), 103 F.3d 1048, 1055-56 (1st Cir. 1997), "the dog's reaction, indicating that [claimant's] money had at some point come into contact with narcotics, weighs some, but not a great deal on the scale." It does retain some probative value, but it alone is insufficient to establish probable cause for forfeiture.

Furthermore, the value of the K-9 alert is further diminished by the dog's reaction to the claimants' currency. See United States v. $ 67,220.00 on U.S. Currency, 957 F.2d 280, 286 (6th Cir. 1992)(vague testimony surrounding the dog alert weakened its value for probable cause). The dog alert, at best, tells us that this currency (like most circulated currency) may have been exposed, at some point, to narcotics. When combined with more compelling evidence of a connection to a narcotics transaction, this kind of dog alert may be probative; but it adds little in this case.

### SUPPLEMENTAL MOTION

On January 21, 2003 the government filed a *Supplemental Motion in Opposition to Motion for Summary Judgment,* advising that the United States Customs Service had indicated that Claimant PATRICIO GONZALEZ INOA was detained by Puerto Rico Police on January 9, 2003, with approximately $300,000.00 in his possession. The Puerto Rico Police Department contacted the United States Customs Service and USCS Special Agent Vargas interviewed GONZALEZ INOA.

CIVIL NO. 01-1803 (RLA)                                             **Page 20**

According to USCS Special Agent Vargas, claimant GONZALEZ allegedly admitted that about $28,000.00 of the $58,920.00 (defendant Property A) forfeited on February 20, 2001 was not his but belonged to an individual known as "Rafita".  The government claims that this creates a genuine issue of material fact that the monies seized originated, in part, from an illegal source.  At the very least, the government argues, it takes away GONZALEZ' standing to recover the $28,000.00 that allegedly belong to "Rafita".

In their Response to Government's Supplemental Motion in Opposition to Summary Judgment, claimants aver that "[t]he recently discovered evidence only pertains to the fact that PATRICIO GONZALEZ has admitted that he is not the owner of the totality of the amount he originally claimed.  This fact cannot be disputed.  With respect to the rest of the money that he does claim is his, he has already presented evidence as to its legal source."

As to claimant MIGUEL REYES, he has presented evidence sufficient to establish his ownership of the money seized; the events of January, 2003 have nothing to do with this claimant and cannot affect his individual and independent claim to the seized monies.

### The $28,000 Belonging to "RAFITA"

As noted above, claimant GONZALEZ accepted that of the $58,920.00 seized on February 20, 2001, $28,000.00 did not belong to him but to an individual named "Rafita", who has not come forward to claim these monies.

**CIVIL NO. 01-1803 (RLA)**                                          **Page 21**

---

As such, claimant GONZALEZ does not have standing to claim this amount.  This, of course, does not limit his standing to claim the remaining $30,920.00, for which he submitted uncontroverted evidence of its legality.

**CONCLUSION**

The evidence presented by the Government in this action is not sufficient to meet the probable cause standard, much less the current standard of preponderance of the evidence to establish a nexus between the defendant currency and any drug transaction or narcotics organization.  Taken in the light most favorable to the Government, there is simply insufficient evidence to establish more than a mere suspicion that claimants were involved with narcotics, and thereby subject defendant properties to forfeiture. Furthermore, claimants have produced uncontroverted evidence that the money seized originated from legal sources.

In conclusion, in this case there is very little more than vague, circumstantial evidence to establish or to tend to establish that the money was drug-related.  In fact, there is little more than a "large sum of cash."  Therefore, the government has not established forfeitability by a preponderance of the evidence.

Accordingly, the Court hereby **DISMISSES** the above-captioned action under Fed. R. Civ. P. 56, and hereby **ORDERS** that the United States return to MIGUEL REYES the amount of **$38,670.00** and to PATRICIO RAFAEL GONZALEZ, the amount of **$30,920.00**.

**CIVIL NO. 01-1803 (RLA)**                                    **Page 22**

Judgment to be entered accordingly.

IT IS SO ORDERED.

San Juan, Puerto Rico, this 6th day of September, 2005.


                                        S/Raymond L. Acosta
                                        RAYMOND L. ACOSTA
                                    United States District Judge